IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JENNIFER AMLET, | ) | |
| | ) | No. 12 C 5249 |
| Plaintiff, | ) | |
| | ) | Magistrate Judge Arlander Keys |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

This case is before the Court on Jennifer Amlet's motion for summary judgment and on the Commissioner's cross-motion for summary judgment. Ms. Amlet seeks reversal or remand of the Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner asks the Court to affirm her decision. For the reasons explained below, Ms. Amlet's motion is denied and the Commissioner's motion is granted.

*Background & Procedural History*

Ms. Amlet filed DIB and SSI applications on September 21, 2009, alleging that she became disabled as of June 1, 2009. Record at 168-77. Her applications were denied initially and upon reconsideration. She then requested, and was granted, a hearing before an administrative law judge, and her case was

assigned to ALJ Robert T. Karmguard, who held the hearing on
April 20, 2011 in Evanston, Illinois.

Upon commencing the hearing, the ALJ advised Ms. Amlet, who
was represented by counsel, that he was not bound by any earlier
determination in her application, but would assess her case
based solely on the evidence contained within the exhibit file,
along with the testimony given at the hearing. Record at 28. The
hearing began with Ms. Amlet's testimony.

### *Ms. Amlet's Testimony*

Ms. Amlet testified that she was 47 years old at the time
of the hearing. Record at 31. She also testified that she
currently lives at home with her mother and granddaughter, and
has done so since October 2009. Record at 31-32, 54-55.
Additionally, prior to Ms. Amlet's testimony, the ALJ confirmed
with Ms. Amlet's attorney that Ms. Amlet's last reported
earnings were in 2009 and amounted to $9,800. Record at 29. Ms.
Amlet also testified that, since her last job in June 2009, she
has not been "receiving any type of disability benefit." Record
at 37.

With respect to her work history, Ms. Amlet testified that
she was employed as a nursing assistant, rehabilitation
assistant or companion from 2001 through 2009. Specifically, she
testified that she was a rehabilitation assistant for a few
months in early 2001 at Red Oaks Nursing Home, a nursing

assistant for a few months in 2001 at a nursing home, a nursing assistant from 2001 to 2004 and a rehabilitation assistant from 2004 to April 2009 at a hospital. Record at 40, 42. Ms. Amlet's attorney brought to the court's attention that Ms. Amlet was laid off from her rehabilitation assistant job at the hospital in April 2009, but Ms. Amlet obtained a new job as a companion/nursing assistant for a family friend from April to June 2009. Record at 30, 37. Ms. Amlet testified that this job ended because the woman passed away. Record at 38. She further testified that she has not worked at all since June 2009

Ms. Amlet testified that, as a nursing assistant, her daily tasks included grooming and helping patients get dressed and washed up and taking the patients' vitals; she was not responsible for bringing prescriptions to the patients; and she rarely had to do any lifting, but if she did, it was less than ten pounds. Record at 40-41. She also testified that, during her typical eight hour shift, she was on her feet, either standing or walking, approximately six hours. Record at 41.

Ms. Amlet testified that, as a rehabilitation assistant, she assisted the physical therapist and was involved in physically working with the patients; her duties included assisting in lifting patients and helping with exercises. Record at 39-40. She further testified that she did not have to lift or carry anything really heavy by herself and, in an eight hour

shift, she was typically on her feet, either standing or walking, approximately six hours. Record at 40.

Ms. Amlet testified that, for her companion/nursing assistant job, she assisted a friend of her mother. Record at 38. Ms. Amlet testified that this job was full-time (eight hours a day, five days a week) and her duties included sitting with her patient, traveling with her to appointments, preparing meals for her, and generally providing companionship. Record at 37-38. She further testified that she did not shop or do household work (other than meal preparation) for her patient, there was no lifting or carrying involved in her duties, and she was on her feet approximately four hours of her eight hour shifts. Record at 37-38.

With respect to Ms. Amlet's medical history and her alleged disability, the record suggests that she was diagnosed with multiple sclerosis ("MS") sometime between 2000 and 2009. Record at 50. Ms. Amlet did not testify – or offer other evidence – concerning an exact diagnosis date. But she claims that her MS became disabling as of June 1, 2009, and the record shows that her doctor was talking about MS as early as 2004. Ms. Amlet testified that, by June 2009, she was experiencing episodes of tiredness, double vision, blurred vision, and headaches. Record at 33-37, 51-52. With respect to the tiredness, Ms. Amlet testified that she had difficulties at her companion/nursing

4

assistant job because, more than once a week, she would fall asleep while working. Record at 35, 53. Ms. Amlet also testified that her headaches occurred about twice a week and had been ongoing for a number of years. Record at 34. She also testified that she normally takes over-the-counter Ibuprofen or Tylenol for her headaches, and that these episodes did not require her to go to the emergency room for treatment. Record at 49. As for Ms. Amlet's eye problems, she testified that both the blurred and double vision occur only in her left eye. Record at 35-37. She testified that the episodes of double vision were infrequent, usually lasted two to three days, and had not happened since before June 2009. Record at 51. She testified that the last time she had double vision, she went to the hospital and a specialist put prisms in the lenses of some specialty glasses for her. Record at 51-52. As for the blurred vision in her left eye, Ms. Amlet testified that this is not episodic; rather it has been ongoing and was still a problem on the day of the hearing. Record at 35-37.

Ms. Amlet also testified that she had been seeing a neurologist, Dr. Peter Chhabria, since 2004. Record at 57. She testified that Dr. Chhabria prescribed daily Copaxone injections for her MS, which she administers herself at home. Record 57. Ms. Amlet testified that she was briefly off of her medication when she was laid off from her job in April 2009, but that, as

of September 2009, Dr. Chhabria helped her make arrangements to obtain her shots for free through the National Organization for Rare Disorders, Inc. ("NORD") and the COPAXONE ® Patient Assistance Program. Record at 57, 60, 286. Ms. Amlet also testified that she has not had an appointment with Dr. Chhabria since October 2010 because she owes him money and cannot afford to pay the bills. Record at 57.

Ms. Amlet testified that, since her alleged disability began in June 2009, and since moving in with her mother in October 2009, she typically spends her days at home or at a friend's home if that friend picks her up for a visit. Record at 31-32, 43. She testified that she needs approximately ten to fifteen minutes to stretch each morning, and that before her MS diagnosis, she did not need to do this. Record at 50. She testified, however, that she does not have difficulty dressing herself or putting on her shoes. Record at 50. She testified that she can usually, depending on the day, walk and stand for approximately thirty to forty-five minutes, and she testified that she can cook and wash dishes. Record at 58. She also testified that, at most, she can lift ten to fifteen pounds, and that she has no difficulty sitting. Record at 58. According to her testimony, a typical day spent at home includes watching television for three to four hours, with intermittent episodes of dozing, preparing her own meals, and doing her laundry; she

testified, however, that for every thirty to forty minutes of activity she does, she needs approximately fifteen minutes to rest before continuing. Record at 43, 49, 54. She also testified that she is able to read with glasses. She testified that she does not vacuum or mop, and the last time she did anything like that was when she lived in her own house in 2009. Record at 44. Ms. Amlet also testified that she has a driver's license with no restrictions, and access to a car. Record at 33. She testified that she sometimes drives herself around – in fact, she drove the day before the hearing.  However, she also testified that, because of the blurred vision in her left eye, she was concerned about her depth perception. She testified that during the past year, she stopped driving alone and often relies on her mother or her friends to drive her. Record at 44, 50-51.

As for errands, Ms. Amlet testified that she never really liked grocery shopping, but she was able to do it and did so about once a month. Record at 44. She testified that she could handle the purchasing transactions and picking up items from the shelf and placing them into her cart; however, she does not carry her groceries from her car to her apartment – her son takes care of that for her. Record at 44, 55. Also, with respect to her vision problems, she testified that she was able to see items on the shelf clearly enough to make her purchases. Record at 61. She also testified that, with her glasses, she is able to

see letters and read, however, she does not read much anymore. Record at 61.

When asked about her social life, Ms. Amlet testified that she would visit with friends a few times a week when they would come visit her at her home or if they drove her to their homes, and she testified that she would go out on "dates," i.e. "going out to eat or something," maybe twice a month but the "dates" would only last for about an hour. Record at 45, 55-56.

The ALJ asked Ms. Amlet how her typical day's activities now compare to her activities in June 2009. Initially, she testified that she "definitely did more [back in June 2009]." Record at 47. However, she then testified that the descriptions she had been giving the ALJ at the hearing had been her typical day for "two, two-and-a-half years" now, i.e. referring back to June 2009. *Id.* She also answered in the affirmative when the ALJ asked her if her "[typical] day was about the same from the time [she] stopped working until [the day of the hearing, April 20, 2011]." *Id.* Finally, she testified that her days have "slowed down since then," and that "it was better in June of '09, [she] could still function better than [she] could now." *Id.*

### *The Vocational Expert's Testimony*

The ALJ also heard testimony from Margaret Ford, a Vocational Expert who reviewed the written information of record

and heard Ms. Amlet's testimony. Record at 62-63. After advising
the ALJ that she had no clarification questions, the VE
testified that Ms. Amlet's prior occupations fell into three
classifications: (i) Certified Nursing Assistant ("CNA") (DOT
code: 355.674-014); (ii) Physical Therapist Aide ("PT Aide")
(DOT code: 355.354-010); and (iii) Companion (DOT code: 309.677-
010). The VE testified that the CNA and PT aide occupations had
skill levels of 4, which are "semi-skilled," and physical
demands of "Medium." Record 63. However, she also testified
that, with respect to the physical demands for the CNA position,
"[Ms. Amlet] indicated she completed it at light." For the PT
Aide position, the VE testified that she was "unable to
determine if [Ms. Amlet] completed it at light or medium duty,"
so she classified it as "medium with assistance." Record at 63,
64. The companion classification had a skill level of 3, which
is low end, semi-skilled, and a physical demand of "light, per
the DOT and how [Ms. Amlet] indicated she completed the job."
Record at 64.

The VE testified that a hypothetical person with
limitations similar to those experienced by Ms. Amlet would be
precluded from working as a CNA or PT Aide; however, such an
individual would still be able to work as a Companion – at least
in the same manner as Ms. Amlet performed her Companion job.
Record at 65. Limiting the hypothetical individual to employment

in Illinois, the VE testified that such a person could perform "light type work" in occupations such as a Cashier (DOT 211.462-010), Order filler (DOT 222.487-014), or Racker (DOT 529.687-018). The VE also testified that, if this same individual had additional limitations (such as an inability to recall, focus on, attend to, or carry out complex or detailed instructions or to perform complex or detailed tasks, but was able to perform simple, routine type instructions and tasks at a workman-like pace), such a person would be precluded from Ms. Amlet's prior Companion job, however, that person could still work as a Cashier, Order filler, or Racker. Record at 66. The VE further testified that if this same individual had additional limitations such as only being able to lift or carry a maximum of ten pounds on occasional basis; lift or carry lighter items such as small hand tools or individual case files on a frequent basis; and walking and standing with normal breaks limited to two total hours in an 8 hour day, this person would be precluded from the previously mentioned jobs. Record at 67. However, this same individual could work at a sedentary, unskilled job such as Bench hand (DOT 715.684-026), Sorter (DOT 521.687-086), or Table worker (DOT 739.687-182). Record at 67. Lastly, the VE testified that, if this hypothetical individual, with all the previously mentioned limitations, also needed to take unscheduled breaks three to four times per day for ten to fifteen minutes, she

10

would be precluded from all work. Record at 69. With respect to breaks and "off-task behavior," the VE testified that the typical tolerance for such behavior is approximately twenty percent of the workday, or six minutes per hour. Record at 69-70.

### *Medical Records*

In addition to the testimony of Ms. Amlet and the VE, the record before the ALJ also included medical records for Ms. Amlet. Those records show that, on May 13, 2004, Ms. Amlet experienced left facial and extremity numbness and was referred to Saint Therese Medical Center for a Brain GAD. Record at 265. According to the records, the brain scan revealed moderate plaque and numerous actively-enhancing lesions, the pattern of which was consistent with multiple sclerosis involving the cerebrum and brain stem. Record at 265.

Ms. Amlet returned to the hospital on December 6, 2004, complaining of severe headaches, visual disturbances, and dizziness. Record at 259-263, 278-281. She was admitted, and on December 7, 2004, the hospital conducted multiple tests: (i) 3D MR angiography of the intracranial arteries, (ii) a 2D MR angiography of the extracranial arteries, and (iii) an MRI. Record at 259. The 3D angiography revealed what appeared to be an aneurysm of the supraclinoid segment of the internal carotid

artery, Record at 259; the 2D angiography was normal, Record at 261; and the MRI revealed "improvement in the appearance of the brain . . . with a pattern of multiple sclerosis," only one actively-enhancing lesion," and "resolution of all of the other previously-enhancing lesions." Record at 262.

On January 4, 2008,[1] another brain MRI was conducted and then compared to the December 7, 2004 MRI. Record at 352. According to the report, this scan showed multiple hyperintense signals in the white matter on FLAIR and T2 sequences. However, the enhancement pattern could not be evaluated due to a lack of intravenous contrast in the current study, and, therefore, it was uncertain whether some of the lesions were active demyelinating plaques. Record at 352.

On March 28, 2008, Dr. Chhabria saw Ms. Amlet for neck pain. Record at 304-305. Dr. Chhabria's assessment indicates: (i) MS, (ii) acute cervical sprain and (iii) overweight. Record at 304. He recommended neck exercises and provided Ms. Amlet with a three-month refill prescription for Copaxone.

Dr. Chhabria saw Ms. Amlet again on July 3, 2008 and December 30, 2008. Record at 306-08. Dr. Chhabria's records for July 3, 2008 indicate that the exam was generally unremarkable, and noted diagnoses of (i) MS, (ii) acute cervical sprain, and (iii) overweight. Record at 306-07. Dr. Chhabria's records for

---

[1] There were no medical records for the time spanning January 2005 to December 2007.

December 30, 2008 indicate that the exam was again "unremarkable," though he did note that Ms. Amlet's weight had increased ten pounds; he also noted a diagnoses of (i) MS, (ii) thyroid goiter, and (iii) overweight. Record at 306-08.

On April 1, 2009, Dr. Chhabria saw Ms. Amlet for left-sided headaches, which she reported had persisted for one month. Record at 310-11. His assessment indicated: (i) left sided headaches — new onset, (ii) MS, (iii) thyroid goiter, and (iv) overweight. Record at 310. He scheduled an MRI, and counseled Ms. Amlet on weight and artherosclerosis risk factors. Record at 311. Additionally, he noted that Ms. Amlet had been given thyroid hormone but had discontinued that treatment when there was no change in the goiter size. Record at 311.

On April 3, 2009, the brain MRI, scheduled in accordance with Dr. Chhabria's April 1, 2009 assessment, was conducted and compared against Ms. Amlet's January 4, 2008 MRI. Record at 276. The report noted there were numerous lesions identified in the periventricular white matter, of which the configuration and orientation were suspicious for demyelinating process such as MS; however, the report also noted that there was no abnormal enhancement to suggest active inflammation or demyelination and no significant change since the prior exam. Record at 276-77.

On September 3, 2009, Ms. Amlet saw Dr. Chhabria for a recurrence of blurred vision and left leg weakness and numbness

over the past month. Record at 312. Dr. Chhabria noted that Ms. Amlet had been laid off from work since April 2009 and had not had Copaxone. Record at 312. His notes also indicated abnormalities in Ms. Amlet's tandem gait test and a Babinski reflex in her left foot. Record at 314. Dr. Chhabria's assessment indicated acute exacerbation of MS and noted that Ms. Amlet was "not fit for work"; he advised her to "avoid hot environment" and discussed restarting Copaxone. Record at 314.

On November 6, 2009, Dr. Richard Bilinsky, a medical consultant for the state agency, completed a Physical Residual Functional Capacity ("RFC") Assessment for Ms. Amlet. Record at 323-330. In his assessment, Dr. Bilinsky found that Ms. Amlet could occasionally lift twenty pounds; frequently lift ten pounds; and sit, stand or walk (with normal breaks) for six hours in an eight hour shift with occasional postural limitations, far acuity visual limitations, and avoidance of extreme heat and hazards. Record at 324-27.

On February 4, 2010, in response to the Appeal Council's request for Ms. Amlet's treatment records, Dr. Chhabria noted no changes from the reports reviewed in the November 6, 2009 assessment; Ms. Amlet's MS was stable, there was no vertigo or stiffness in her legs, and the tandem gait test still showed abnormalities. Record at 336-46.

On March 4, 2010, in a Request for Medical Advice for the Illinois SSA, Dr. Virgilio Pilapil reconsidered and affirmed Dr. Bilinsky's November 6, 2009 findings. Record at 347-49.

On April 12, 2010, Ms. Amlet was hospitalized for a central nervous system vascular accident ("CVA"), though the record does not include any medical records documenting the incident or the hospitalization. There is a brief mention between Ms. Amlet's attorney and the ALJ concerning the issue and the ALJ does reference the hospitalization in his decision. Record at 17, 28-29. But the Court is unable to make any independent findings concerning this event.

On September 29, 2010, Ms. Amlet was brought to Northwest Lake Forest Hospital by ambulance and admitted for abrupt arm and leg stiffness; the stiffness resolved upon arrival in the emergency room. Record at 395. The records from that day indicate that, after a warm shower, Ms. Amlet's arms and legs felt stiff and tight, and that this had never happened previously; the nurse noted that Ms. Amlet's pain level was a five out of ten. Record at 395-97. The attending physician indicated impressions of MS and myalgias and instructed Ms. Amlet to continue with Copaxone and to follow-up with Dr. Chhabria. Record at 396. Aside from a heightened glucose level of 105 (60-100 being an acceptable range), all other tests were unremarkable. Record at 395-96.

15

On October 5, 2010, Dr. Chhabria saw Ms. Amlet as a follow-up to her September 29, 2010 emergency room visit. Record at 401. He noted that Ms. Amlet had experienced muscle spasms for 30 minutes and feared an MS relapse, but otherwise all tests were unremarkable or unchanged from prior records. Record at 401.

On October 22, 2010, Dr. Chhabria completed an MS RFC Questionnaire. Record at 388. Dr. Chhabria confirmed Ms. Amlet's MS diagnosis and that he had been treating her for more than four years; he gave a "guarded" prognosis and indicated that Ms. Amlet was not a malingerer. Record at 388. Dr. Chhabria reported that Ms. Amlet's symptoms included fatigue; balance problems; poor coordination; unstable walking; numbness, tingling or other sensory disturbance; and double or blurred vision/partial or complete blindness. Record at 388. He also checked "yes" when asked if Ms. Amlet had "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station" and reported that Ms. Amlet had ataxia. Record at 389. However, in the next question, he reported that Ms. Amlet did not have "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity" as a result of her MS, and that, during the past year, she did not have any exacerbations of MS. Record at 389. Dr. Chhabria also

16

checked "yes" when asked whether Ms. Amlet's fatigue was "best
described as lassitude rather than fatigue of motor function";
he also indicated that this was the kind of fatigue MS patients
typically complain about. Record at 389. Noting that Ms. Amlet's
symptoms, which were severe enough to interfere with attention
and concentration, occurred often, Dr. Chhabria opined that Ms.
Amlet was capable of tolerating low stress jobs. Record at 390.
He also confirmed that Ms. Amlet's impairments have lasted or
can be expected to last at least twelve months. Record at 390.
Dr. Chhabria reported that Ms. Amlet could walk one city block
without rest, sit for one hour before needing to get up, stand
for thirty minutes before needing to rest, stand or walk for
less than two total hours in an eight hour day (with normal
breaks), lift twenty pounds frequently, crouch occasionally,
climb ladders occasionally, and climb stairs occasionally.
Record at 390-92. Lastly, Dr. Chhabria indicated that Ms. Amlet
should avoid all exposure to extreme heat, would need to take
approximately three to four unscheduled breaks per day for ten
to fifteen minutes, and would likely be absent from work about
two days per month due to her impairments. Record at 391, 393

### *The ALJ's decision*

The ALJ issued his decision on April 29, 2011, finding that
Ms. Amlet was "not disabled" and denying Ms. Amlet's claim for

17

DIB and SSI. Record at 20. In his decision, the ALJ determined
that Ms. Amlet met the insured status requirements of the Social
Security Act through December 31, 2013 and had not engaged in
substantial gainful activity since June 1, 2009. Record at 14.
He also found that Ms. Amlet has the following severe
impairments: MS, status post stroke (CVA), and overweight
habitus (20 C.F.R. §§ 404.1520(c), 416.920(c)); he found,
however, that Ms. Amlet does not have an impairment or
combination of impairments that meets or medically equals one of
the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925 and 416.926). Record at 14. The ALJ
determined that Ms. Amlet has the Residual Functional Capacity
to perform sedentary work which may, in an eight hour day,
include lifting or carrying up to ten pounds occasionally;
lifting or carrying lighter items such as small hand tools or
individual case files frequently; standing or walking with
normal breaks for up to a combined total of two hours, but for
no more than fifteen continuous minutes; sitting with normal
breaks for up to six hours; and climbing ramps or stairs,
balancing, stooping, kneeling, crouching and crawling no more
than occasionally. Record at 15. The ALJ determined that Ms.
Amlet could not climb ladders, ropes or scaffolds, and must
avoid exposure to extreme heat, height hazards, and machinery

18

hazards. Record at 15. Additionally, he indicated that Ms. Amlet does not possess the capacity to recall, focus upon, attend to or carry out complex or detailed instructions or to perform complex or detailed tasks; but she does retain such capacity with respect to simple routine instructions and tasks at a sustained workmanlike pace. Record at 15. In making this determination, the ALJ found that the limitations set forth in Dr. Chhabria's MS RFC Questionnaire on October 22, 2010 were not consistent with or supported by Dr. Chhabria's own record of treatment (citing Exhibits 6F, Record at 295-318; 15F, Record at 356-74; and 19F, Record at 398-403) or with the remainder of the medical record. Record at 18. In accordance with this RFC, the ALJ found that Ms. Amlet was unable to perform any of her past work, but that she could perform other jobs that existed in the national and local economies in significant numbers. Record at 18-19. Finally, the ALJ noted that, at forty-five years old on the alleged disability onset date, Ms. Amlet was considered to be a "younger individual," meaning that his findings were unaffected by the grid. Record at 19.

After the Appeals Council denied review, Ms. Amlet filed suit in this Court, seeking review of the Social Security Administration's final agency decision. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on September 28, 2012. The case is

now before the Court on cross motions for summary judgment: Ms. Amlet asks the Court to reverse the Commissioner's decision denying her benefits, or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the agency's decision.

## *Discussion*

### *Applicable Law*

An individual claiming a need for DIB or SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden

of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele,* 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that

decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

### *Analysis of Ms. Amlet's Arguments*

Ms. Amlet argues that the ALJ's decision should be reversed or remanded because the ALJ (i) failed to properly determine whether Ms. Amlet's impairments met or equaled listings 11.04 or 11.09; (ii) failed to weigh and consider all of the evidence of record resulting in an erroneous RFC determination; (iii) made an improper credibility determination, and (iv) erroneously concluded, at step five, that she could perform other work.

### *1. Impairment Listing*

Ms. Amlet first argues that the ALJ failed to properly evaluate whether her impairments met or equaled the criteria required for Listings 11.04, Central Nervous System Vascular Accident or 11.09, Multiple Sclerosis. In particular, Ms. Amlet argues that the ALJ failed to (i) evaluate any of the evidence that was favorable to her claims; (ii) consider or assess her visual impairments under Listings 2.02–2.04 as applicable to 11.09(B), and (iii) consider the aggregate effect of Ms. Amlet's impairments in determining whether they functionally equaled any Listing. Record at 448–50.

In his decision, the ALJ found that "[Ms. Amlet] does not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Record at 41. He reasoned that "neither section 11.04 or 11.09 are met because [Ms. Amlet's] condition has not resulted in disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station." Record at 42. Ms. Amlet argues that this is a "superficial and conclusory finding" and "unsupported." Record at 448. Thus, the question before the Court is whether the ALJ's finding is (i) specific to one of the three criteria found under 11.09, (ii) supported by substantial evidence and (iii) free from legal error. 42 U.S.C. § 405(g); *Steele,* 290 F.3d at 940.

When evaluating impairments caused by MS, the ALJ considers criteria set forth under Listing 11.09. Due to the episodic nature of MS conditions, "consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00(D). Because a claimant need only demonstrate that her impairments meet the requirements of one of the three paragraphs under this listing: 11.09(A), 11.09(B), *or* 11.09(C), "an ALJ should mention the specific listings he is considering[;] his failure to do so, if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Barnett v.*

*Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)). *See also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Indeed, "where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele,* 290 F.3d at 940. That said, however, the Court will "read the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 Fed. App'x. 674, 678-679 (7th Cir. 2010) (explaining that an ALJ's finding is not unreasoned where the ALJ's analysis is not itemized into individual paragraphs, i.e. there is "no requirement of such tidy packaging").

Section 11.09(A) provides criteria for evaluating disorganization of motor function when an individual is *at rest*. Specifically, the criteria under § 11.09(A) is cross-referenced with § 11.04(B), which requires that an individual show that, more than three months after a vascular accident, she exhibits "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.09(A), § 11.04(B). Furthermore, § 11.04(B) also references § 11.00(C) which identifies that:

> [p]ersistent disorganization of motor function in the
> form of paresis or paralysis, tremor or other
> involuntary movements, ataxia and sensory disturbances

> (any or all of which may be due to cerebral cerebellar
> [sic], brain stem, spinal cord, or peripheral nerve
> dysfunction) which occur singly or in various
> combination, frequently provides the sole or partial
> basis for decision in cases of neurological
> impairment. The assessment of impairment depends on
> the degree of interference with locomotion and/or
> interference with the use of fingers, hands, and arms.
> 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00(C).

Additionally, when considering § 11.09(A), the ALJ must also take "into account any further increase in muscle weakness resulting from activity."[2] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00(E).

As made evident in the ALJ's use of verbatim language ("disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station"), the ALJ was referring to Listing 11.09(A) when he found that Ms. Amlet's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Ms. Amlet argues that, in rendering this decision, the ALJ failed to evaluate any of the evidence that was favorable to her claim and failed to consider the aggregate effect of her impairments. Specifically, Ms. Amlet argues that the ALJ failed to consider her treatment records from Dr. Chhabria, which noted severe headaches,

---

[2] Determining whether the claimant's impairments qualify under 11.09(A) or 11.09(C) depends on whether the motor abnormalities at issue occur *during activity* or *at rest*, i.e., if the abnormalities are present while the individual is *at rest*, 11.09(A) must be used, whereas, if the abnormalities occur *during activity*, then 11.09(C) is used. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00(E).

dizziness, nausea, vomiting, obesity, lightheadedness, tandem gait abnormalities, weakness, and numbness to the right foot. She also argues that the ALJ erred in dismissing Dr. Chhabria's recommendation that Ms. Amlet should avoid hot environments and that she was "not fit to work."

While it is true that the ALJ did not address these impairments directly in his finding under Step Three, he did address each in his analysis under Step Four. He noted that Ms. Amlet has been experiencing episodes of tiredness since June 2009, that she reported a history of headaches which occur about two to three times per week, and that her medical records intermittently noted symptoms of dizziness and vomiting. Record at 15-17. He also noted, however, that no symptoms of headache, or extremity numbness or weakness were reported as of March 2008 or on September 29, 2010, and that Ms. Amlet's headaches have not required emergency room treatment and can be treated with Tylenol. In addition, he noted that no symptoms of dizziness or vertigo were reported on September 3, 2009; February 4, 2010; or September 29, 2010. *Id*. Furthermore, the ALJ acknowledged that Dr. Chhabria identified Ms. Amlet as "overweight" in his treatment records after each of her visits; however, despite the fact that Dr. Chhabria never diagnosed Ms. Amlet as "obese," the ALJ still addressed "obesity" as a factor in his analysis:

> Because there is no listing for obesity, this
> condition will be found to "meet" the requirements of
> a listing if an individual has another impairment that
> by itself meets the requirement of a listing or, if
> there is an impairment that in combination with
> obesity, meets the requirements of a listing.
> Record at 15.

With respect to her tandem gait abnormalities, Ms. Amlet asserts that Dr. Chhabria "continually noted" these abnormalities, however, the ALJ noted numerous occasions that Dr. Chhabria recorded that Ms. Amlet's gait was normal or unremarkable: March 28, 2008; December 2008; April 1, 2009; and September 29, 2010. Record at 15–18.

Most notable to the Court's analysis, however, is the requirement that the claimant must show that her impairments emerged "more than three months after a vascular accident." There seem to be inconsistent records regarding when the alleged Central Nervous System Vascular Accident ("CVA") occurred, or if it even occurred at all. The ALJ indicated that "Exhibit 16F contains notes regarding an April 12, 2010 hospitalization for stroke/CVA on April 12, 2010"; however, the ALJ also questioned Ms. Amlet's attorney about the event, and the attorney advised the ALJ that "there was no stroke at that time." Record at 17, 28.

Therefore, the Court finds that there is substantial evidence to support the ALJ's finding that Ms. Amlet's

impairments did not meet or equal the criteria of Listing
11.09(A).

Section 11.09(B) provides references to listings 2.02,
2.03, and 2.04[3] for evaluating visual or mental impairments
caused by MS. 20 C.F.R. Part 404, Subpart P, Appendix 1, §
11.00(E).

> 2.02 Loss of central visual acuity. Remaining vision
>     in the better eye after best correction is 20/200 or
>     less.
> 2.03 Contraction of the visual field in the better
>     eye, with:
>     A. The widest diameter subtending an angle around
>         the point of fixation no greater than 20 degrees.
>     OR
>     B. An MD of 22 decibels or greater, determined by
>         automated static threshold perimetry that
>         measures the central 30 degrees of the visual
>         field (see 2.00A6d).
>     OR
>     C. A visual field efficiency of 20 percent or less,
>         determined by kinetic perimetry (see 2.00A7c).
> 2.04 Loss of visual efficiency, or visual impairment,
>     in the better eye:
>     A. A visual efficiency percentage of 20 or less
>         after best correction (see 2.00A7d).
>     OR
>     B. A visual impairment value of 1.00 or greater
>         after best correction (see 2.00A8d).
> 20 C.F.R. PART 404 APPENDIX 1, § 2.02-2.04.

Ms. Amlet argues that the ALJ did not analyze the criteria under
listings 2.02-2.04 with respect to her headaches, blurred
vision, and double vision. Although she acknowledges that the
ALJ need not evaluate every piece of evidence, she contends that

---

[3] § 11.09(B) also provides a reference to 12.02, which is omitted here, because the
criteria under 12.02 are not applicable to the facts of this immediate case.

his failure to "evaluate any of the evidence that potentially supported [Ms. Amlet's] claim does not provide much assurance that he adequately considered her case." Record at 449.

§ 11.00(E) identifies that "[s]ensory abnormalities may occur, particularly involving central visual acuity," and when the ALJ is considering a claimant's central visual acuity in MS cases, the impairment "should be evaluated under the criteria in listing 2.02, taking into account the fact that the decrease in visual acuity will wax and wane." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00(E). Additionally, the ALJ should consider that "the decrease in visual acuity may occur after brief attempts at activity involving near vision, such as reading[, and that this] decrease in visual acuity may not persist when the specific activity is terminated, as with rest, but is predictably reproduced with resumption of the activity." *Id.*

Although the ALJ did not expressly state that his analysis was in reference to the criteria under 2.02, his decision included a discussion of evidence pertaining to Ms. Amlet's visual impairments. Specifically, he acknowledged Ms. Amlet's problems with blurred vision, noting that it was an on-going issue with regular frequency, and he acknowledged that Ms. Amlet testified to double vision episodes in her left eye. Record at 15. Additionally, he noted that Dr. Chhabria's treatment notes, dated September 3, 2009, indicated that Ms. Amlet had been seen

for a one month recurrence of blurred vision. Record at 17. On the other hand, the ALJ noted that Ms. Amlet has not experienced any episodes of double vision since she stopped working in June 2009 and, with respect to her blurred vision, she can read the newspaper when wearing her glasses. Record at 15. The ALJ also noted that, when Ms. Amlet saw Dr. Chhabria in September 2009, she had been laid off from work and not been taking her Copaxone medication, and in an assessment of November 6, 2009, which was readopted in March 4, 2010, the state agency reviewing physician "noted that, although visual blurring may occur during acute MS exacerbations, there were no active visual limitations." Record at 17. Lastly, Dr. Chhabria's treatment notes from an October 5, 2010 visit noted that "no visual abnormalities were reported." Record at 18.

Ms. Amlet did not provide any objective evidence to support a favorable finding under § 11.09B. Specifically, she failed to provide the Court with any medical assessment of her better eye's vision acuity, i.e. whether it was worse than 20/200 or whether it met any of the criteria specified under §§ 2.02-2.04. Therefore, the Court finds that there is substantial evidence to support the ALJ's finding that Ms. Amlet's impairments did not meet or equal the criteria of Listing 11.09(B).

Section 11.09(C) provides criteria for evaluating the impairment of individuals who do not have muscle weakness or

30

other significant disorganization of motor function *at rest*, but who have "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.09(C).

Use of the criteria in § 11.09(C) is dependent upon (i) documenting a diagnosis of multiple sclerosis, (ii) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (iii) obtaining evidence that the system has actually become fatigued. The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness.

In addition to the collateral RFC analysis discussed under § 11.09(A), the ALJ noted specifically that, on the October 22, 2010 RFC Questionnaire, Dr. Chhabria checked "No" to Question #7, thereby indicating that Ms. Amlet did not have "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." Record at 18, 389. Therefore, the Court finds that there is

31

substantial evidence to support the ALJ's finding that Ms.
Amlet's impairments did not meet or equal the criteria of
Listing 11.09(C).

### 2. RFC Determination

Next, Ms. Amlet argues that the ALJ failed to properly
weigh and consider all of the evidence of record, thus resulting
in an erroneous RFC determination. In particular, she argues
that the ALJ (i) erred in discounting the severity of her
headaches, (ii) did not give enough credit to the treating
physician's impressions, and (iii) failed to take into
consideration her obesity. Record at 450.

When assessing an individual's RFC, the ALJ is determining
"the most [an individual] can still do despite [her]
limitations," and he "must evaluate all limitations that arise
from medically determinable impairments, even those that are not
severe." 20 C.F.R. § 404.1545(a)(1); *Villano v. Astrue*, 556 F.3d
558, 563 (7th Cir. 2009) (citing S.S.R. 96-8p). As with the
prior issue pertaining to impairment listings, the Court will
affirm the ALJ's RFC determination if it is supported by
substantial evidence and free from legal error. 42 U.S.C. §
405(g); *Steele*, 290 F.3d at 940.

Ms. Amlet argues that the ALJ failed to properly consider
evidence with respect to her headaches in his RFC determination.
Record at 450. First, Ms. Amlet suggests that the ALJ had a duty

to assess the severity of her headaches, as well as label them "severe" or "not severe." Record at 451. Second, she claims that the ALJ "erroneously dismisse[d] consideration of the effect of [her headaches] because she only took over-the-counter pain medication and did not seek pain treatment at an ER." *Id.* Third, she asserts that his failure to find that her headaches were "severe" demonstrates that he disregarded the effect of her headaches when he evaluated her ability to work. *Id.*

While it is true that the ALJ did not find Ms. Amlet's headaches to be "severe impairments" at step two, the ALJ does not need to find that every alleged impairment is "severe" or "not severe." *Raines v. Astrue*, No. 06-cv-0472-DFH-TAB, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007). *See also* 20 C.F.R. § 404.1521 (defining and explaining what qualifies an impairment as "not severe"). Rather, this is "merely a threshold requirement," insofar as the claimant must show that she suffers from one or more severe impairments, before the ALJ continues the analysis under step three. *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). So long as the claimant shows that at least one impairment is severe, and the ALJ, in turn, continues the evaluation onto step three, "no error could result solely from [the ALJ's] failure to label an impairment as 'severe.'" *Raines*, 2007 WL 1455890, at *7. In fact, the ALJ's failure to label Ms. Amlet's headaches as "severe" at Step Two has little bearing on

33

whether or not he will consider them in later steps of the evaluation: after finding "that one or more of [the claimant's] impairments is 'severe,' the ALJ then consider[s] the aggregate effect of [the claimant's] *entire constellation of ailments — including those impairments that in isolation are not severe*." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. Ind. 2003) (emphasis added) (citing 20 C.F.R. § 404.1523; *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000); *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000)). Accordingly, the ALJ did not have a duty to assess and classify the severity of Ms. Amlet's headaches, and his failure to find them to be "severe" is not grounds for remand.

Ms. Amlet next contends that, when the ALJ determined her RFC, he failed to consider her headaches and the limitations caused thereby. After finding that one or more of the claimant's impairments is "severe" in Step Two, the ALJ must consider all of the claimant's impairments (both "severe" and "not severe") and their aggregate effects in the subsequent evaluation steps; as such, the ALJ was required to consider Ms. Amlet's headaches in his evaluations. But the ALJ's decision makes multiple references to Ms. Amlet's headaches through his discussion of her testimony, Dr. Chhabria's treatment records, and other medical records. Record at 15-18. And "the [ALJ] found that [Ms. Amlet's] medically determinable impairments [notably,

her MS] could reasonably be expected to cause [her] alleged symptoms." Record at 18. "Symptoms" are "[the claimant's] own description of [his] physical or mental impairments" and the intensity and persistence of these impairments. 20 C.F.R. § 404.1528(a), 404.1529.  More to the point, in his decision, the ALJ stated that "[i]n making this finding, [he] has considered all symptoms" Record at 15.

When evaluating a claimant's ability to work, the ALJ must consider all "symptoms." 20 C.F.R. § 404.1528(a), 404.1529. Such statements alone, however, "are not enough to establish that there is a physical or mental impairment"; the ALJ must also consider "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence[4] and other evidence." 20 C.F.R. § 404.1528(b) and (c), and § 404.1529. "Objective medical evidence" is particularly useful to an ALJ when "making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect those symptoms, such as pain, may have on [a claimant's] ability to work." 20 C.F.R. § 404.1529(c)(2). On the other hand, "other evidence" includes statements or reports "about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how

---

[4] Objective medical evidence includes "medical signs" or "laboratory findings," i.e. "anatomical, physiological, or psychological abnormalities [or phenomena]," which must be shown by medically-acceptable clinical, or laboratory, diagnostic techniques, respectively. 20 C.F.R. § 404.1528(b) and (c), and § 404.1529.

[the] impairment(s) and any related symptoms affect [the claimant's] ability to work"; these statements may be provided by the claimant, her treating or non-treating physician, or others. 20 C.F.R. § 404.1529. *See* §§ 404.1512(b)(2)-(8), 404.1513(b)(1), (4), and (5), and (d). Moreover, with respect to "other evidence," the ALJ will consider any of the following factors that are relevant to the claimant's symptoms:

   i. daily activities;
   ii. the location, duration, frequency, and intensity of pain or other symptoms;
   iii. precipitating and aggravating factors;
   iv. the type, dosage, effectiveness, and side effects of any medication currently being taken, or taken in the past, to alleviate pain or other symptoms;
   v. treatment, other than medication, for relief of pain or other symptoms;
   vi. any measures that the claimant takes or has taken to relieve pain or other symptoms (e.g., lying flat on the back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
   vii. other factors concerning functional limitations and restrictions due to pain or other symptoms.
20 C.F.R. 404.1529(c)(3)(i-vii).

Consistent with the evaluating criteria identified above, the ALJ's assessment begins with an accounting of Ms. Amlet's symptoms. Record at 15-16. Specifically, he notes that Ms. Amlet "reported a history of headaches which initially occurred about twice per week," though "[a]t present, she experiences episodes 2 to 3 times per week"; "[s]he has not required emergency room treatment for headaches; and [she] takes Tylenol for pain." Record at 16.

Ordinarily, his next step would have included evaluating any objective medical evidence with respect to her headaches. While his decision includes numerous references to MRIs, brain scans, and neurological exams, it does not include any objective medical evidence with respect to Ms. Amlet's headaches. Although the medical records contained multiple MRI reports, which ultimately revealed brain patterns consistent with multiple sclerosis, none of these reports specifically addressed or substantiated Ms. Amlet's headaches symptoms.

Next, the ALJ should have considered "other evidence." Calling upon Ms. Amlet's medical history, the ALJ's decision identifies three separate visits when Dr. Chhabria documented Ms. Amlet's complaints of headaches: April 1, and September 3, 2009, and October 5, 2010. Record at 16-18. He also considered the RFC assessment prepared by the state agency's consulting physician, Dr. Bilinsky. In particular, he noted that Dr. Bilinsky limited Ms. Amlet's "light" residual capacity "with a need to avoid extremes of heat and work place hazards." Record at 17.

While the ALJ also noted Dr. Chhabria's recommendations that Ms. Amlet avoid exposure to heat and hazards, his observation of Dr. Bilinsky's recommendation and the additional remarks are especially relevant. The additional remarks in Dr. Bilinsky's assessment connect the dots between Ms. Amlet's (i)

37

acute exacerbations, which are brought upon by her (ii) MS, in the form of (iii) headaches and (iv) blurry vision and (v) Ms. Amlet's need to avoid concentrated exposure to heat and hazards. Record at 17. More to the point, the ALJ incorporated these environmental limitations, i.e. avoiding heat and hazards, into the hypotheticals he posed to the VE at the hearing, and he included these same limitations in his RFC determination. Record at 68. Thus, the Court is persuaded that the ALJ did evaluate the impact of Ms. Amlet's headaches; in fact, he found that they had some impact on her ability to work, and he accounted for that impact in his RFC.

Lastly, the guidelines include factors that the ALJ may consider, if relevant. The ALJ's decision shows that he considered at least three of the seven factors. He noted that: Ms. Amlet takes over-the-counter medications medication (factor iv), her headaches do not require her to go to the emergency room (factor vi), and, as previously mentioned, she should avoid such "aggravating factors" as extreme heat and hazards (factor ii). Thus, contrary to Ms. Amlet's argument that the ALJ was *in error* when he considered her use of over-the-counter medications and her lack of emergency room visits, the ALJ was actually performing his evaluations exactly as the guidelines recommended.

Next, Ms. Amlet argues that the ALJ's actions equated to "playing doctor," insofar as he "rejected all opinions of record and made [] medical conclusion[s] without any expert evidence." She argues that the ALJ erred in not giving proper weight to Dr. Chhabria's medical opinion, and even dismissing it without reason at times. She also claims that the ALJ failed to follow the medical opinion of the state agency consulting physician, Dr. Bilinsky. Record at 453.

Ordinarily, "[a] treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'consistent with substantial evidence in the record.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). In deciding what weight to give an opinion, the applicable regulations "identify[] several factors that an ALJ must consider: 'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010)(quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) and citing 20 C.F.R. §§ 404.1527(d)(2), 404.927(d)(2). Moreover, an ALJ may

"discount a treating physician's medical opinion if the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, *as long as [the ALJ] minimally articulates his reasons* for crediting or rejecting evidence of disability.'" *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (emphasis added) (quoting *Skarbek*, 390 F.3d at 503). Finally, even when an ALJ has sufficient grounds to discount a treating physician's opinion, the courts have also held that "an ALJ cannot make [his] own independent medical determinations about the claimant," and "[he] improperly 'play[s] doctor' when he makes a medical conclusion without expert evidence." *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).

The Court first considers Ms. Amlet's claim that the ALJ erred in assigning little probative value to the medical opinions of her treating physician, Dr. Chhabria. Record at 452. Specifically, she alleges that the ALJ erred in finding that Ms. Amlet has experienced "no MS exacerbations, she has 'responded to medication,' and her MS was stable," all of which, she claims, are contrary to Dr. Chhabria's opinion. Record at 452. It is true that the ALJ noted – twice -- that Ms. Amlet had no exacerbations. However, Ms. Amlet fails to note that, when both entries are read in their entirety, or even with just a few

surrounding words, the ALJ is actually observing that no exacerbations occurred *during, or in, the past year*. More to the point, the ALJ made these statements specifically in reference to notes and answers found in Dr. Chhabria's October 22, 2010 RFC Questionnaire, in which Dr. Chhabria answered, "none" to Question #8: "During the past year what are the approximate dates of exacerbations of [MS]". Record at 18, 389.

As for the ALJ's statements that she "responded to medication" and was "stable," Ms. Amlet argues that the ALJ failed to provide any support for his conclusory statements about her medication and he erred in finding that Ms. Amlet's MS was stable because "a description of 'stable' only indicates no deterioration/worsening, not that she had improved to where she could work full time." Record at 452. In point of fact, the complete sentence in the ALJ's decision reads, "Treatment records from Dr. Chhabria indicate that claimant's MS is stable and she has responded to medication." Record at 18. This statement is supported by substantial evidence insofar as the "[t]reatment records" are Dr. Chhabria's records dated February 4, and October 5, 2010, and which state, "Copaxone tolerated well" and "MS stable on Copaxone; no side effect to Copaxone reported," respectively. Record at 398, 401. Admittedly, "responded to medication" was not Dr. Chhabria's exact turn of phrase; however, when taken in the context of Dr. Chhabria's

41

assessment that the MS was "stable on Copaxone," the ALJ's choice of words is consistent and does not suggest that he was "playing doctor."

Ms. Amlet argues that the ALJ refused to follow the medical opinion of the state agency consulting physician, Dr. Bilinsky. Record at 453. Moreover, she argues, the ALJ erred in calling into question Dr. Chhabria's credibility and dismissing his opinion, which suggested that Ms. Amlet required greater limitations and that she was "not fit for work."

Ms. Amlet claims that the ALJ erred in "fail[ing] to indicate why no acuity limitations were included in his RFC" when the state agency reviewing physician, Dr. Bilinsky, recommended that Ms. Amlet's RFC visual limitations include "far acuity." Record at 453. The ALJ did, in fact, provide a reason for not including visual limitations in his RFC determination. "[Dr. Bilinsky] noted that, although visual blurring may occur during MS exacerbations, there were no active visual limitations." Record at 17. This reasoning is supported by the record insofar as (i) Dr. Bilinsky added a qualifying notation to the "far acuity" limitation that "[d]uring times of acute exacerbation the claimant's vision may be blurry," and (ii) Dr. Bilinsky noted Dr. Chhabria's records which identified that while Ms. Amlet "[complains of] visual blurring," under "Eyes,"

her exam and visual fields were both "normal." Record at 326, 330.

Moreover, despite Ms. Amlet's contention, the ALJ's decision thus far illustrates quite clearly that the ALJ not only considered all medical opinions (from both the treating physician and the consulting physicians), but throughout his decision, he adopted many of their recommendations and incorporated their impressions into his findings.

To begin with, of the eight additional physical limitations that the ALJ adopted in his RFC determination, six are in accordance with, or exceed, any limitations suggested in Dr. Chhabria's RFC Questionnaire or testified to by Ms. Amlet. The ALJ extended greater limitations to Ms. Amlet in (i) the maximum weight and frequency limits of the lift/carry category; (ii) the maximum continuous time in the stand/walk category, prohibiting (iii) climbing ladders, ropes or scaffolds and (iv) hazards. He also stipulated that Ms. Amlet (v) *may* climb ramps/stairs, balance, stoop, kneel, crouch and crawl no more than occasionally and (vi) must avoid concentrated exposure to extreme heat. Record at 15. Moreover, the ALJ's decision scrupulously noted the chronology of Ms. Amlet's medical history and the complained of symptoms, test results, diagnoses, assessments and treatments therein. Record at 15-18.

Effectively, the ALJ's RFC determination rejected two of Dr. Chhabria's impressions: (i) the opinion that Ms. Amlet could sit for no more than one hour at a time, and (ii) the recommendation that Ms. Amlet is "not fit for work."  Ms. Amlet seems to have no quarrel with the ALJ's limitations with respect to sitting.[5]  She does, however, dispute the ALJ's rejection of the "not fit for work" conclusion.

While a treating physician's opinion may be controlling with respect to the nature and severity of medical conditions, "a claimant is not entitled to disability benefits simply because her physician finds that she is 'disabled' or 'unable to work.'" 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). *See Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) (holding that "disability" is not a medical finding; rather, it's a legal determination). These types of medical source opinions, e.g. "unable to work," "disabled," etc., are actually opinions that are exclusively reserved to the Commissioner, or the ALJ. 20 CFR 404.1527(d)(2); *Schmidt v.*

---

[5] Had Ms. Amlet challenged the sitting conclusion, the challenge would have failed. The ALJ elected to follow the recommendation of the state agency reviewing physician, Dr. Bilinsky, who opined that Ms. Amlet was capable of sitting for up to six hours at a time in an eight hour workday. Despite the other factors which would support according Dr. Chhabria's opinion significant weight (e.g. he was Ms. Amlet's treating physician; he specialized in neurology, and, more specifically, treating MS patients; and he had been treating Ms. Amlet for nearly three to four years), Dr. Chhabria offered no explanation for his conclusion that Ms. Amlet could sit for no more than one hour at one time, nor did his treatment records ever indicate any reference to Ms. Amlet having any problems with sitting. Indeed, at the hearing, Ms. Amlet testified that she had no problems with sitting. Record at 58.

*Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). This is not to say that the treating physician's opinion is of no import; rather, because this type of opinion directly speaks to "administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability," they cannot be afforded controlling weight. Accordingly, Dr. Chhabria's opinion that Ms. Amlet is "not fit to work" is not controlling in these proceedings.

Lastly, the ALJ's decision specifically stated that "the limitations imposed [in Dr. Chhabria's RFC Questionnaire] are not consistent with or supported by the doctors [sic] own record of treatment . . . or with the remainder of the medical record." Record at 18. The ALJ explained that Dr. Chhabria's "statement that [the] claimant is 'not fit to work' is unsupported by [Dr. Chhabria's] own treatment notes." Record at 18.

While the statement "not fit to work" does not have controlling weight here, Ms. Amlet is correct that it is still an opinion that should be considered by the ALJ. And, as with other medical opinions made by treating physicians, the ALJ must provide a reason for rejecting such evidence. See *Skarbek*, 390 F.3d at 503 (holding that an ALJ may dismiss a treating physician's opinion if the ALJ finds the opinion is "internally inconsistent, as long as [the ALJ] minimally articulates his reasons for crediting or rejecting evidence of disability").

45

In support of his conclusion, the ALJ cites the following notes from Dr. Chhabria's records: "claimant's MS is stable and she has responded to medication"; "[s]he has not had an exacerbation in the past year"; "[t]reatment notes dated February 4, 2010 reveal no new excerbations [sic] reported"; "[t]he Copaxone was tolerated well and no side effects were reported"; and "[Dr. Chhabria's] own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect id [sic] the claimant were in fact disabled, and [he] did not specifically address this issue." Record at 18. Additionally, he noted a conflicting opinion in Dr. Bilinsky's RFC Assessment: "reviewing physician opined as to a *light* residual capacity." Record at 17 (emphasis added). The Court finds that the ALJ adequately explained his decision to discount Dr. Chhabria's conclusion, and there is substantial evidence in the record to support this explanation.

Next, Ms. Amlet argues that the ALJ erred in failing to sufficiently consider her obesity in the RFC and credibility findings. First, she claims that he failed to consider that her obesity "most certainly aggravated" her "neck pain, weakness, leg numbness, leg pain, myalgias, arm/leg stiffness, poor balance/coordination, unstable walking and musculoskeletal condition/MS." Record at 453. Second, she argues that the ALJ

failed to consider obesity in combination with all of her other severe and non-severe impairments.

The listing for obesity (9.09) no longer exists; in its stead, Social Security Rulings 02-1p provides the necessary guidance "concerning the evaluation of obesity in disability claims." SSR 02-1p. When an individual claims obesity as an impairment, or "the evidence [provides sufficient notice to] alert[] the ALJ that the individual ha[s] another relevant impairment," the ALJ "must consider the effects of obesity together with the underlying impairments." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006); *Clifford*, 227 F.3d at 873.

When the ALJ has identified "obesity as a medically determinable impairment, [he also needs to] consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments [that have been] identified." SSR 02-1p. Moreover, when deciding whether the impairment is "severe" at step two, the ALJ must perform "an individualized assessment of the impact of obesity on an individual's functioning."[6] SSR 02-1p.  With respect to step

---

[6] This individualized assessment is required because "[t]here is no specific level of weight of BMI that equates with a 'severe' or a 'not severe' impairment" and "[there are no] descriptive terms for levels of obesity [which] establish whether obesity is or is not a 'severe' impairment." SSR 02-1p, 2002 SSR LEXIS 1, 12 (Dec. 5, 2013).

three, the ALJ "find[s] that an individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing [or] if there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-1p. However, "[the ALJ does] not make assumptions about the severity or functional effects of obesity combined with other impairments"; rather, he evaluates "each case based on the information in the case record." SSR 02-1p. Finally, in steps four and five, the ALJ considers how the individual's "[o]besity can cause limitation of function."[7] SSR 02-1p. SSR 02-1p requires an ALJ to assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02-1p.

Ms. Amlet alleged in her Prehearing Memorandum that she suffered from "obesity," and she claimed that "[t]he combined effects of obesity with neurological impairments is greater than the effects of each of the impairments considered separately[, and that] her obesity has a cumulative affect with the other disabilities." Record at 251. Accordingly, the the ALJ had

---

[7] Such limitations may affect an individual's (i) exertional functions (such as sitting, standing, walking, lifting, carrying, pushing, and pulling); (ii) ability to do postural functions (such as climbing, balance, stooping, and crouching); (iii) hand and finger manipulations; and (iv) ability to tolerate extreme heat, humidity, or hazards. SSR 02-1p, 2002 SSR LEXIS 1, 16 (Dec. 5, 2013)

sufficient notice that he needed to assess Ms. Amlet's alleged obesity as an impairment.

Whether the ALJ considered obesity in his RFC determination is less clear, since he did not expressly indicate that he accounted for Ms. Amlet's weight in his RFC determination. An ALJ's failure to explicitly consider the claimant's weight may be considered harmless error where "it is factored indirectly into the ALJ's decision as part of the doctor's opinion." *Skarbek*, 390 F.3d at 504. And, more recently, courts have held that "any error in failing to mention obesity is harmless if the claimant did not explain to the ALJ how her obesity aggravated her condition and rendered her disabled[; a] mere assertion that [claimant] is obese [does] not satisfy that burden." *Mueller v. Colvin*, 524 Fed. App'x. 282, 286 (7th Cir. 2013); *Prochaska*, 454 F.3d at 737; *Skarbek*, 390 F.3d at 504.

At step two, the ALJ included Ms. Amlet's weight in his listing of "severe impairments." Record at 14 (overweight habitus, 20 C.F.R. 404.1520(c) and 416.920(c)). At step three, he found that it did not meet or medically equal one of the listed impairments. *Id.* As there is no listing for obesity, the ALJ also noted in his decision that "this condition will be found to "meet" the requirements of a listing if an individual has another impairment that by itself meets the requirements of a listing or, if there is an impairment that in combination with

obesity, meets the requirements of a listing." *Id.* The ALJ also
noted Dr. Chhabria's treatment records and Dr. Bilinsky's RFC
assessment, which identified Ms. Amlet's overweight status. *Id.*
at 16-17. In fact, in multiple earlier treatment records, Dr.
Chhabria noted that he had counseled Ms. Amlet on weight
reduction, thereby indicating his awareness and active medical
interest in her weight. Lastly, and as previously discussed, of
the eight physical limitations that the ALJ included in Ms.
Amlet's RFC, six were in accordance with, or exceeded, any
limitations suggested in Dr. Chhabria's RFC Questionnaire or
testified to by Ms. Amlet. The remaining two limitations in
conflict had to do with how long Ms. Amlet could sit and whether
she could work; however, neither Ms. Amlet nor Dr. Chhabria
submitted any evidence pertaining to, or testified regarding,
how her weight affected her ability to sit or work, in general.

As in *Skarbek*, the ALJ here adopted most of the limitations
suggested by Dr. Chhabria, who had been treating Ms. Amlet for
nearly four years and was aware of Ms. Amlet's weight issue.
Moreover, Ms. Amlet's brief to this Court argues that the ALJ
did not take into consideration that her obesity "most certainly
aggravated" her "neck pain, weakness, leg numbness, leg pain,
myalgias, arm/leg stiffness, poor balance/coordination, unstable
walking and musculoskeletal condition/MS." However, in her
Prehearing Memorandum to the ALJ, her supposition as to the

effects of her obesity were far more vague, only stating, "[t]he combined effects of obesity with neurological impairments is greater than the effects of each of the impairments considered separately[, and] her obesity has a cumulative affect with the other disabilities." Notably, the ALJ only saw the latter statement. Accordingly, the Court finds that the ALJ's failure to explicitly document the considerations taken in regard to Ms. Amlet's obesity is no more than harmless error.

### *3. Adverse Credibility*

Next, Ms. Amlet challenges the ALJ's determination that her statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent and, therefore, not credible. Record at 454. According to Ms. Amlet, the ALJ improperly opined that her daily activities were not limited to the extent that one would expect from a "disabled individual." *Id.* Moreover, she argues that he mischaracterized much of her testimony and oversimplified the manner and context in which she carried out activities, particularly with respect to her ability to complete chores and errands. *Id.* Lastly, Ms. Amlet argues that the ALJ failed to provide any reasons to support his credibility finding. *Id.*

When reviewing adverse credibility determinations, the Court affords considerable deference to the ALJ's determination, as it is the *ALJ* who "[is] in the best position to see and hear

the witnesses and assess their forthrightness." Powers v. Apfel,
207 F.3d 431, 435 (7th Cir. 2000). The Court does not "undertake
a de novo review of the medical evidence that was presented to
the ALJ[; i]nstead, [it] examine[s] whether the ALJ's
determination was reasoned and supported." *Elder v. Astrue*, 529
F.3d 408, 413 (7th Cir. 2008). *See also Jens*, 347 F.3d at 213-14
(7th Cir. 2003); *Powers*, 207 F.3d at 435. Accordingly, ALJs are
required to "supply 'specific reasons' for a credibility
finding"; simply stating "that 'the individual's allegations
have been considered' or that 'the allegations are (or are not)
credible' is insufficient." *Golembiewski*, 322 F.3d at 915
(quoting SSR 96-7p).

Ms. Amlet argues that the ALJ called her credibility into
question because "[her] daily activities are not limited to the
extent one would expect of a *disabled individual*." Record at 454
(emphasis added). In fact, the ALJ compared her activities not
against those "of a disabled individual," but rather against "[*her*]
complaints of disabling *symptoms and limitations*." that *she* had
proffered before the court. There is a considerable difference
between these two statements. Within the construct of Ms. Amlet's
argument, the ALJ would have been comparing her activities
against those of another individual with MS; however, as
written, the ALJ was more accurately, noting the
inconsistencies, and, therefore, the unreliability, of Ms.

Amlet's testimony. Contrary to her argument, the ALJ did not determine that, *because* of these activities, she had the capability to work full-time; instead, he concluded that the "intensity, persistence, and limiting effects" of her symptoms did not coincide with those activities.

Additionally, Ms. Amlet argues that the ALJ noted her ability to do daily chores, but that he pointedly "ignored her need for rest periods." Record at 454. Not so. The ALJ explicitly noted, *twice*, that Ms. Amlet needed to rest when she performed chores. Moreover, his consideration of her need to rest is demonstrated in the evidence insofar as he reduced her RFC to sedentary and he limited her standing/walking time to 15 minute segments. Accordingly, the Court finds that there was nothing "patently wrong" with the ALJ's adverse credibility determination.

### *4. Step Five*

Lastly, Ms. Amlet argues that the ALJ's Step Five finding was erroneous. That is to say, the ALJ's analysis and findings in the earlier steps of the evaluation process resulted in a deficient RFC. His reliance upon the deficient RFC, in turn, resulted in incomplete hypotheticals — insofar as the ALJ failed to account for all of Ms. Amlet's relevant limitations such as far acuity, obesity, lightheadedness, visual disturbance, dizziness, and blurred vision, as well as the severity of her

ataxia and fatigue. The incomplete hypotheticals, she argues, resulted in the VE testifying that Ms. Amlet was "able to perform the requirements of representative sedentary-unskilled occupations," and that "work in that field exists in "significant numbers in the national economy." Thus, to the extent that the ALJ relied upon the VE's testimony, Ms. Amlet contends that his finding that Ms. Amlet is "not disabled" is flawed and requires remand.

In step five of the sequential evaluation process, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education and work experience. 20 C.F.R. 404.1520(g), 416.920(g). To aid in making this determination, the ALJ may pose hypothetical questions to a VE, and these questions "must include all limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942 (citing *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993); *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999); *Winfrey v. Chater*, 92 F.3d 1017, 1024 n.5 (10th Cir. 1996)). However, "an incomplete hypothetical question may be cured by a showing that prior to testifying the vocational expert reviewed the claimant's record containing the omitted information." *Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. Ill. 1995). That is the case here. At the outset of her testimony, the VE testified that she had reviewed the written information of the record in the case,

54

listened to Ms. Amlet's testimony, and, from her perspective, there were no "areas of the testimony or of the records . . . that require[d] any clarification." Record at 62-63. Accordingly, the Court finds that the ALJ reasonably relied on the VE's testimony.

### *Conclusion*

For the reasons set forth above, the Court finds that (i) there is substantial evidence to support the ALJ's conclusion that Ms. Amlet's impairments did not meet or medically equal Listings 11.09(A), 11.09(B) and 11.09(C); (ii) the ALJ properly weighed and considered all of the evidence in making his RFC determination; (iii) there is substantial evidence to support the ALJ's adverse credibility determination; and (iv) the ALJ's Step Five Finding is not erroneous. Therefore, the Court finds, that the ALJ's decision is supported by substantial evidence and should be affirmed.

Accordingly, the Court denies Ms. Amlet's Motion for Summary Judgment and grants the Commissioner's Motion for Summary Judgment.

Date: January 7, 2014

E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT